# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-5236

LOUIS R. FRANTZIS, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 14, 2022                                    Decided June 21, 2022)

*Robert C. Brown, Jr.*, of Norman, Oklahoma, for the appellant.

*Brent A. Bowker*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Kenneth A. Walsh*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, FALVEY, and JAQUITH, *Judges*.

ALLEN, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a dissenting opinion.

ALLEN, *Judge*: Appellant Louis R. Frantzis served the Nation honorably in the United States Army from October 1979 to October 1982.[1] In this appeal, which is timely and over which we have jurisdiction,[2] he contests a September 11, 2019, Board of Veterans' Appeals decision that denied entitlement to (1) a compensable disability rating for service-connected tension headaches effective from October 15, 2009, to February 10, 2010, and a disability rating greater than 10% effective from February 11, 2010, to November 12, 2014; and (2) an effective date before October 15, 2009, for his service-connected tension headaches.[3] This matter was submitted to a panel of the Court principally to address whether a claimant proceeding under the Veterans Appeals

---

[1] Record (R.) at 3114.

[2] *See* 38 U.S.C. §§ 7252(a), 7266(a).

[3] R. at 7-14.

Improvement and Modernization Act of 2017 (AMA)[4] is entitled to an opportunity for a Board hearing before the Board member who will ultimately decide his or her administrative appeal.[5]

We briefly preview what we decide: The Court holds that nothing in the AMA or its implementing regulations mandates that the Board member conducting a claimant's Board hearing must ultimately decide the appeal. While there was such a requirement in place under the Legacy Appeals System, when Congress enacted the AMA as the successor to the Legacy Appeals System, Congress removed the statutory language that required the same Board member who conducted a hearing to also participate in the appeal's final determination. Additionally, there is nothing in VA's implementing regulations that creates the purported right appellant seeks to have the Court vindicate. Given that nothing in the relevant statutes or regulations dictates that the Board member who presides at a hearing must render the Board's decision, appellant can only prevail if some other principle (such as the fair process doctrine) imposes that requirement. But we decline to consider whether there is such an extrastatutory or extraregulatory source of the supposed requirement that appellant advances because he did not make such an argument until well into the appeal.

We have also considered appellant's subsidiary argument that the Board ignored both his and his wife's hearing testimony concerning the prostrating nature of appellant's headaches. We reject the contention because it is clear that the Board did not ignore this evidence. Rather, the Board performed its duty as factfinder when it determined that the statements were outweighed by other record evidence.

Accordingly, having rejected all of appellant's arguments that he put forth in this appeal, we will affirm the September 2019 Board decision.

---

[4] 115 Pub. L. No. 55, 131 Stat. 1105 (Aug. 23, 2017).

[5] The Court thanks the students, faculty, and staff at the University of Florida (UF) Levin College of Law for their flexibility regarding oral argument. We were supposed to have held argument at UF law on April 14, 2022. At the last moment, we were unable to do so. The Court looks forward to traveling to UF for argument soon. And we also thank counsel for both parties for their flexibility concerning the last-minute changes to the argument schedule.

## I. FACTS AND PROCEDURAL HISTORY

In October 2009, appellant sought service connection for several conditions, including headaches.[6] A November 2009 rating decision denied his claims, and the regional office (RO) continued those denials in an August 2010 Statement of the Case.[7] Appellant appealed the decision to the Board and requested a hearing.[8] At a July 2013 Board hearing, appellant testified that his headaches were caused by his service when he was kicked by another soldier.[9] In particular, he recounted that he was kicked in the chest by a soldier, which caused him to be lifted into the air, and that he then hit the back of his head on a concrete slab.[10] Appellant stated that he had serious headaches that affected his vision as a result of the in-service incident.[11] The Board eventually remanded appellant's service-connection claim for headaches for further development.[12]

In August 2014, the RO granted appellant service connection for headaches, assigning a noncompensable disability rating.[13] Appellant timely disagreed with the decision, and his claim has been in an appellate status since.[14] Through the course of his appeal, VA revised appellant's evaluations for his service-connected headaches to the following: 0% effective from October 15, 2009, to February 10, 2010; 10% from February 11, 2010, to November 12, 2014; and 50% beginning November 13, 2014.[15]

In June 2018, appellant opted into the Rapid Appeals Modernization Program (RAMP), converting his claim to one pursued under the AMA.[16] Through a Higher Level Review conducted under the AMA process, VA issued a rating decision in September 2018 (via appellant's RAMP

---

[6] R. at 3098.

[7] R. at 3015-16, 2938-63.

[8] R. at 2780. The July 2013 Board hearing was conducted by Board member George Guido. Given the procedural history of appellant's appeal, which, as we will discuss, includes the conversion of his appeal from the Legacy System to one under the AMA, appellant does not take issue with the July 2013 hearing. *See* Appellant's Brief (Br.) at 6-13. We will similarly limit our discussion to the later hearing appellant had before the Board.

[9] R. at 2780.

[10] R. at 2780, 2782.

[11] R. at 2783-84.

[12] R. at 2736-38.

[13] R. at 2479-94.

[14] R. at 2476-77.

[15] R. at 2412-33.

[16] R. at 87-98.

election) that continued appellant's assigned disability ratings.[17] Appellant timely disagreed with the decision and appealed to the Board, requesting a hearing with a Board member.[18]

On May 6, 2019, appellant and his wife testified at a Board hearing that was conducted by Board member James Reinhart.[19] At the hearing, appellant and his wife testified that he experiences prostrating headaches.[20] His wife also testified that around 2013 appellant's headaches began to affect his ability to work.[21]

On September 11, 2019, Board member Theresa Catino issued the decision currently on appeal.[22] The decision noted that appellant "testified at a videoconference hearing before a [Board member] in May 2019 and a transcript of that hearing has been associated with the claims file," and that appellant testified at the July 2013 Board hearing.[23] The decision acknowledged the testimony that "the severity of [appellant's] headaches [have] been characteristic of prostrating attacks since 2009," but the Board found that "the evidence does not show that [appellant's] headaches were productive of prostrating attacks . . . or resulted in extreme exhaustion or powerlessness."[24] The Board noted appellant's VA treatment records and his April 2014 examination that "indicated that his headaches were of less severity and contemporaneously documented his symptoms and the severity of his headaches."[25] Accordingly, the Board determined that the lay assertions of prostrating attacks were outweighed by other record evidence.[26]

---

[17] R. at 91-93.

[18] R. at 82-85.

[19] R. at 44-67.

[20] R. at 51-59.

[21] R. at 61.

[22] R. at 7-14.

[23] R. at 9, 11.

[24] R. at 12.

[25] R. at 12-13.

[26] R. at 13.

## II. PARTIES' ARGUMENTS

Appellant contends that 38 U.S.C. § 7102 requires that the same Board member who conducts a hearing must also issue a decision in the appeal. Appellant points to the portion of the statute that states: "A member or panel assigned a proceeding shall make a determination thereon . . . ."[27] In particular, he argues that the statute's use of the word "shall" in the provision indicates Congress's intent to require the same Board member who conducts a hearing to also issue the appeal's decision.[28]

Appellant further argues that the Board failed to consider favorable evidence when it determined that appellant's headaches were not productive of prostrating attacks. Alternatively, appellant contends that the Board did not provide adequate reasons or bases for its decision in terms of the evidence it addressed. Specifically, he asserts that the Board failed to adequately discuss his and his wife's testimony about the onset, worsening, and prostrating nature of his headaches.

The Secretary responds that there is no requirement under the AMA that the same Board member who presides at a hearing also issue the decision in an appeal. Specifically, the Secretary highlights that section 7107 is the relevant statutory authority because it governs Board hearings—unlike section 7102, which concerns the assignment of appeals. The Secretary points out that when Congress enacted the AMA it expressly removed the requirement under section 7107 in the Legacy Appeals System that the Board member who presides at a hearing must participate in making the final determination of the claim. Additionally, the Secretary points to the pertinent regulatory authority in which VA has expressly retained the requirement for only Legacy appeals.[29]

Further, the Secretary argues that the Board did not err when it determined that appellant's headaches were not productive of prostrating attacks. The Secretary contends that the Board considered appellant's and his wife's testimony but ultimately assigned that testimony less probative weight than the contemporaneous medical evidence.

---

[27] Appellant's Br. at 6-7 (citing 38 U.S.C. § 7102(a)).

[28] *Id.* at 7.

[29] Secretary's Br. at 7 (citing 38 C.F.R. §§ 20.604, 3.2400(b)).

### III. ANALYSIS

*A. Under the AMA, a Board member who conducts a Board hearing*
*is not required to decide the appeal.*

Appellant's principal argument is that he has a right to a hearing before the Board member who will ultimately issue a decision in his appeal. He grounds his argument on the statutes that control appeals under the AMA. So, we must review those statutory provisions, and the regulations associated with them, to determine whether appellant is correct. As we will explain, we conclude that the pertinent statutory and regulatory authority does not require the Board member conducting a Board hearing to ultimately issue the decision in the appeal.

We begin with some context about what Congress did when it enacted the AMA. As an initial matter, we highlight that Congress did not replace the existing administrative appeals process—the Legacy process—when it created the AMA.[30] A claimant was in the Legacy system if the initial decision on a claim was rendered before February 19, 2019, and, correspondingly, under the AMA when the initial decision on the claim was rendered on or after February 19, 2019.[31] But the line Congress drew was not entirely immune from a claimant's choice about the system in which he or she would proceed. After Congress enacted the AMA, VA, acting pursuant to congressional authorization, provided claimants in the Legacy appeals system the opportunity to opt in to the RAMP.[32] Upon opting in to the RAMP, a claimant's appeal would become subject to the processes and authorities under the AMA.[33] So, after opting in, the AMA (via the RAMP) provides claimants with options to file (1) a request for a Higher-Level Review of their rating decision, (2) a supplemental claim, or (3) a Notice of Disagreement (NOD) requesting direct Board review.[34] When appealing to the Board, a claimant has the options of (1) a direct review based on the evidence before the agency of original jurisdiction, (2) an additional evidence docket in which the claimant has the right to submit additional evidence within certain time parameters, or (3) a hearing docket in which the claimant is afforded a hearing before a Board member and may also

---

[30] *See Mattox v. McDonough*, 34 Vet.App. 61, 68 (2021).

[31] *Id*. at 68-69.

[32] *See* 115 Pub. L. No. 55, 131 Stat. 1105, 1120 ("The Secretary of Veterans Affairs may, under subsection (a)(1), carry out a program to provide the option of an alternative appeals process.").

[33] *See id.*

[34] 38 U.S.C. § 5104C(1); *Andrews v. McDonough*, 34 Vet.App. 151, 157 (2021).

submit evidence in certain prescribed periods.[35] As previously mentioned, appellant opted in to the RAMP in June 2018, therefore subjecting himself to the laws under the AMA.[36] And he later selected the hearing docket.[37]

With the AMA-Legacy context established, we return to the issue before us. Questions of statutory interpretation are pure questions of law that the Court reviews de novo.[38] We look to the plain meaning of the statute, and when we find the plain meaning, our job is simply to apply it.[39] "In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'"[40] But context "inform[s] any statutory provision's plain meaning."[41] And, importantly, "in interpreting a statute a court should always turn first to one, cardinal canon before all others . . . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."[42] With these principles in mind, we turn to the questions before us.

### 1. 38 U.S.C. §§ 7102, 7107

As relevant to this appeal, two statutes are in play. Appellant relies on 38 U.S.C. § 7102(a) to argue that the same Board member who conducts a Board hearing must also issue the decision in the appeal. The Secretary argues that section 7102 does not control, and instead focuses on section 7107. While the Court has not addressed these statutory provisions under the AMA, we have considered the provisions as they existed in the context of the Legacy Appeals System in *Arneson v. Shinseki*.[43] *Arneson*'s discussion provides useful context for our analysis. There, the Court determined "that the pertinent statutes and implementing regulation regarding Board

---

[35] *See* 38 U.S.C. § 7105(b)(2)(c); 38 C.F.R. § 20.202(b) (2021); *Andrews*, 34 Vet.App. at 157.

[36] *See* R. at 87-98.

[37] R. at 82-85.

[38] *See Saunders v. Wilkie*, 886 F.3d 1356, 1360 (Fed. Cir. 2018); *see also Casey v. Wilkie*, 31 Vet.App. 260, 265 (2019).

[39] *Frederick v. Shinseki*, 684 F.3d 1263, 1269 (Fed. Cir. 2012); *see also Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400, 2415, 204 L. Ed.2d 841 (2019); *Artis v. District of Columbia*, ___ U.S. ___, 138 S. Ct. 594, 603, 199 L. Ed.2d 473 (2018) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[40] *Casey*, 31 Vet.App. at 265.

[41] *Id.*

[42] *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

[43] *See Arneson*, 24 Vet.App. at 382-83.

hearings entitle a claimant to an opportunity for a hearing before all the Board members who will ultimately decide his appeal," and vacated the Board's decision because one member of the three Board member panel had not participated in a Board hearing with the claimant.[44] Notably, the Court did not rely whatsoever on section 7102 in rendering the decision.[45] Rather, the Court focused on section 7107 as it then existed.[46] We explained that the "1994 statutory amendments restructured [section 7102] and separated the provision regarding the assignment of Board members from the provision regarding hearings."[47] This created a statutory structure in which section 7102 governed the assignment of cases to Board members and section 7107 governed Board hearings.[48] Significantly, the AMA did not change the statutory scheme we recognized in *Arneson*. Section 7102 continues to concern the assignment of appeals and section 7107 continues to address hearings.[49] In fact, section 7107 retains its title: "Appeals: dockets; hearings."[50]

"'[T]he statutory scheme as a whole, the specific context in which [a] word or provision at issue is used, and the broader context of the statute as a whole' all inform any statutory provision's plain meaning."[51] Therefore, we will begin our analysis with the statute that continues to govern Board hearings: Section 7107. Before the passage of the AMA, section 7107(c) (2016) provided:

> A hearing docket shall be maintained and formal recorded hearings shall be held by such member or members of the Board as the Chairman may designate. Such member or members designated by the Chairman to conduct the hearing shall, except in the case of a reconsideration of a decision under section 7103 of this title, participate in making the final determination of the claim.[52]

It was this statutory provision on which the Court put great weight in *Arneson* when it held that the law at the time required all Board members who participated in rendering a decision must

---

[44] *Id.* at 386. The two other Board members each conducted separate hearings with the claimant through the course of his appeal. *Id.* at 380-81.

[45] *See id.* at 382-89.

[46] *Id.* at 383-86.

[47] *Id.* at 384.

[48] *Id.*

[49] *See* 38 U.S.C. §§ 7102, 7107 (2021).

[50] 38 U.S.C. § 7107.

[51] *See Casey*, 31 Vet.App. at 265 (quoting *Hornick v. Shinseki*, 24 Vet.App. 50, 52 (2010)).

[52] 38 U.S.C. § 7107(c) (2016).

also have been involved in a Board hearing afforded to appellant.[53] Congress significantly revised this section when it enacted the AMA. Notably, Congress removed the language from section 7107 that required the Board member who conducted a Board hearing to "participate in making the final determination of the claim."[54] The post-AMA version of section 7107(c) provides for the "[m]anner and scheduling of hearings for cases on a docket that may include a hearing." The section no longer requires that the Board member conducting a hearing must participate in the final determination.[55] Indeed, that requirement appears nowhere in the statute. In other words, Congress did not merely move the language around when it enacted the AMA; it deleted it entirely.

We find the removal of this statutory language in section 7107(c) highly significant. First, "Congress is presumed to know of existing laws and regulations when it enacts new legislation."[56] Therefore, we can presume that Congress understood the nature of our *Arneson* holding that interpreted the language of pre-AMA section 7107(c)—in addition to the pertinent regulation at the time—to require the Board member who conducted a hearing to also decide the appeal.[57] So it's reasonable to say that Congress knew this was the law and intended to remove the requirement when it amended section 7107 and omitted that critical language.

Second, even if we don't employ the presumption about Congress knowing the law when it acts and we say that Congress did not know about *Arneson*, our conclusion remains the same. Congress still consciously elected to remove the requirement that a Board member who conducts a hearing must "participate in making the final determination of the claim."[58] That language was plain, nontechnical, and easy to understand. "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect."[59] Appellant's argument essentially asks us to ignore Congress's amendment to section 7107 and to give no effect whatsoever to the removal of the language requiring the Board member conducting a hearing to

---

[53] *Arneson*, 24 Vet.App. at 383-85.

[54] *See* 38 U.S.C. § 7107(c) (2017).

[55] 38 U.S.C. § 7107(c) (2017).

[56] *Beaudette v. McDonough*, 34 Vet.App. 95, 103 (2021) (citing *Cal. Indus. Prods., Inc. v. United States*, 436 F.3d 1341, 1354 (Fed. Cir. 2006)).

[57] *See Arneson*, 24 Vet.App. at 386.

[58] *See* 38 U.S.C. § 7107(c) (2017). *Compare id.*, *with* 38 U.S.C. § 7107(c) (2021).

[59] *Ross v. Blake*, 578 U.S. 632, 641-42 (2016) (cleaned up).

9

also participate in the final determination. That is not our job. Courts do not re-insert statutory provisions that Congress has removed. Stated in the affirmative, our task is to give effect to statutes as Congress has written them.[60] It is clear from the plain language of section 7107 that it no longer requires the Board member who conducts a hearing to also decide the claim. Indeed, Congress's removal of the statutory language is a significant indication of its intent to no longer maintain such a requirement under the AMA.

But that does not end our inquiry because appellant contends that section 7102 contains such a requirement. We do not agree. Section 7102(a) provides:

> A proceeding instituted before the Board may be assigned to an individual member of the Board or to a panel of not less than three members of the Board. A member or panel assigned a proceeding shall make a determination thereon, including any motion filed in connection therewith. The member or panel, as the case may be, shall make a report under section 7104(d) of this title on any such determination, which report shall constitute the final disposition of the proceeding by the member or panel.[61]

Appellant points to that portion of the statute that states that "[a] member or panel assigned a proceeding shall make a determination thereon," and puts great emphasis on Congress's use of the word "shall."[62] Appellant is certainly correct that "shall" is generally a mandatory term.[63] But that is neither here nor there. The use of the mandatory term "shall" is irrelevant to appellant's argument because section 7102 does not govern Board hearings; the plain language of the statute just does not speak to the issue at hand.

Section 7102 governs the assignment of cases to Board members; it does not govern Board hearings. As we explained, *Arneson* delineates the respective functions of sections 7102 and 7107.[64] In *Arneson*, we unequivocally found that section 7102 does *not* govern Board hearings and we did *not* rely on section 7102 to answer a question similar to the one before us today.[65] To be

---

[60] *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992) (noting "the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written").

[61] 38 U.S.C. § 7102(a) (2021).

[62] Appellant's Br. at 6-7.

[63] *See Quinn v. Wilkie*, 31 Vet.App. 284, 291 (2019) (citing *Kingdomware Techs., Inc. v. United States*, __ U.S. __, 136 S. Ct. 1969, 1977, 195 L. Ed.2d 334 (2016)).

[64] *See Arneson*, 24 Vet.App. at 384.

[65] *Id.*

sure, the AMA wrought many changes to VA's administrative appeals process. But Congress did not change the respective focuses of sections 7102 and 7107.[66] We see no reason to depart from *Arneson*'s interpretation of the statute concerning the matters to which sections 7102 and 7107 speak and appellant has given us none.[67]

Appellant points out that Congress did not amend section 7102 when it enacted the AMA as support for his argument that section 7102 requires the Board member conducting a hearing to also decide the appeal.[68] We agree that this fact is important, but we think it cuts in precisely the opposite direction. As appellant pointed out, the language that he relies on in section 7102 is the same language that appeared in the statute when the Court decided *Arneson*.[69] But, again, in *Arneson* we found that section 7102 did *not* govern the issue concerning hearings—that was section 7107, something Congress *did* change.[70] So, appellant essentially asks the Court to find statutory language *dispositive* today that we previously found *irrelevant* when deciding a nearly identical question. Viewed differently, Congress is well aware how to include a requirement that the Board member conducting a hearing must also participate in the decision. We know that is the case because Congress did so in connection with Legacy appeals in the pre-AMA version of section 7107.[71] In addition, before 1994, Congress actually used section 7102 to do what appellant claims it does today. Before 1994, section 7102 required that "formal recorded hearings shall be held by such member or members as the Chairman may designate, the member or members being

---

[66] The dissent posits that the "'refocusing' of 38 U.S.C. § 7107 deleted the codification of the veteran's right to a hearing in section 7107(b)," and if our "construction of these statutes takes hold, the veteran's right to a hearing is in peril." *See post* at note 186. To be clear, our decision today does not offer any opinion as to how the revisions of section 7107 affect an appellant's right to a hearing. While the time may come to make such a determination, it is not today.

[67] As our dissenting colleague points out, *Arneson* determined that "the Board violated 38 U.S.C. §§ 7102, 7107, and 38 C.F.R. § 20.707." *Arneson*, 24 Vet.App. at 386. Importantly, the Court did not rely on any specific language in section 7102 to render its holding. As we do here, *Arneson* considered section 7102 together with section 7107 to determine that the two sections govern different topics. *See Arneson*, 24 Vet.App. at 384. The only specific language of the post-1994 section 7102 that the Court mentioned was the portion of section 7102(a) that "allows an appeal to 'be assigned to an individual member of the Board or to a panel of not less than three members of the Board.'" *Id.* at 384-85 (emphasis omitted) (quoting 38 U.S.C. § 7102(a)). *Arneson*'s ultimate determination concerning the statutory scheme was that Congress had not directly spoken to "the question of whether a claimant is entitled to a hearing before all the Board members assigned to decide his appeal." *Id.* at 385. In sum, our analysis of section 7102 today is fully consistent with the Court's views when we decided *Arneson*: section 7102 does not govern Board hearings.

[68] Appellant's Br. at 7-8; Reply Br. at 1-5.

[69] *See* Reply Br. at 2. *Compare* 38 U.S.C. § 7107 (2016), *with* 38 U.S.C. § 7107 (2017).

[70] *See Arneson*, 24 Vet.App. at 384.

[71] 38 U.S.C. § 7107(c) (2016).

11

of the section which will make final determination in the claim."[72] Clearly Congress has been familiar with this statutory requirement for years, and if we were deciding this appeal in 1993, appellant's argument would be correct. But the year is 2022. There is just no escaping that in 1994 Congress moved the relevant statutory language from section 7102 to section 7107, and when Congress enacted the AMA it removed the relevant statutory language entirely from section 7107 (and everywhere else in the title 38); we must give this exclusion the effect that Congress intended because that is what courts do.[73] Otherwise, we would be acting as little more than a follow-on legislature, imposing our own requirements in place of those the elected Members of Congress determined should be the law.

In sum, we hold that nothing in the statutory provisions Congress enacted as part of the AMA requires that the Board member who conducts a hearing must also decide the appeal.[74] And to be clear, the converse is true as well; the statutes don't prohibit VA from allowing a different Board member to decide the appeal than the one who conducted a hearing. Given the statutory structure of sections 7102 and 7107, Congress's removal of the precise language in section 7107 that required the same Board member to decide an appeal when it enacted the AMA is highly significant. The short story here is: *Congress* at one point mandated what appellant seeks the Court to order here; *Congress* removed the requirement that provided for what appellant seeks; and that means appellant cannot prevail on his statutory argument.[75]

---

[72] 38 U.S.C. § 7102(b) (1993).

[73] *See Ross*, 578 U.S. at 641-42.

[74] We note that we do not need to resort to the pro-veteran canon of construction because we find the statutes clear as to the issue; in other words, we do not find the statutes ambiguous. *See Sharp v. Shinseki*, 23 Vet.App. 267, 275 (2009) ("In the face of statutory ambiguity . . . the Court applies the rule that 'interpretative doubt is to be resolved in the veteran's favor.'") (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994))).

[75] Although not briefed by appellant, at one point during oral argument appellant commented that his position is bolstered because a "hearing" is a "proceeding" within the meaning of section 7102. *See* Oral Argument (OA) at 13:35-18:08, *Frantzis v. McDonough*, U.S. Vet. App. No. 20-5236 (oral argument held Apr. 14, 2022), http://www.uscourts.cavc.gov/oral_arguments_audio.php. Putting aside that this comment is entirely inconsistent with the statutory structure explained in *Arneson*, we find appellant's comment without merit. "Proceeding" is not defined within title 38 of the U.S. Code, but appellant's interpretation is inconsistent with how "proceeding" is used in section 7102 and in other statutes. The first sentence of section 7102 states: "A proceeding *instituted* before the Board . . . ." 38 U.S.C. § 7102 (emphasis added). If, as appellant suggests, a "hearing" is a "proceeding," then that sentence can be read to say, "a hearing instituted before the Board." That is almost nonsensical and inconsistent with other ways in which Congress used this term. *See* 38 U.S.C. § 7104 (stating that the Board's decision will be based "on the entire record in the proceeding and upon consideration of all evidence and material of record and applicable provisions of law and regulation"); 38 U.S.C. § 7105 (governing when appellate review to the Board is initiated by the "[f]iling of appeal"; read in context, "appeal" is referring to all the acts and events that will occur between the initiation of appellate

<u>2. VA's implementing regulations, 38 C.F.R. §§ 20.604, 20.706 (2021),</u>
<u>do not assist appellant.</u>

We briefly consider VA's implementation of the AMA to complete our exploration of the issue on appeal. After all, Congress did not bar VA from imposing the requirement appellant advances here, so, in theory, appellant could prevail if VA determined that it would have the same Board member conduct a hearing and issue a decision in an appeal.[76] But it has not done so.

The Secretary has promulgated separate regulatory provisions governing Board hearings under the Legacy Appeals System and those under the AMA.[77] For Legacy appeals, 38 C.F.R. § 20.604 (2021)[78] provides that "[t]he Member or Members who conduct the hearing shall participate in making the final determination of the claim."[79] Under the general rules for Board hearings, which apply to AMA appeals, 38 C.F.R. § 20.706 (2021)[80] provides that "[h]earings will be conducted by a Member or panel of Members of the Board. Where a proceeding has been assigned to a panel, the Chairman, or the Chairman's designee, shall designate one of the Members as the presiding Member." The "right" appellant seeks is clearly mandated under the Legacy appeal system, but that does not help because his appeal is proceeding under the AMA. There simply is no regulation that provides appellant with a right to have the same Board member who presides at a hearing render a decision in his appeal.

### 3. The Fair Process Doctrine

Up until now, we've explained that appellant's argument that he is entitled to have the same Board member who presided at his hearing also decide his appeal finds no support in either the applicable statutes or VA's implementing regulations. So, for appellant to prevail on his argument, there would have to be some other source of law that requires it. However, appellant focused his arguments entirely on his flawed understanding of section 7102.

---

review and the final determination).

[76] *See Chevron*, 467 U.S. at 844-45. To be clear, appellant has not argued that the statutes are ambiguous or that VA's implementing regulations provide him with the right he seeks. *See* Appellant's Br. at 5-13; Reply Br. at 1-5. Rather, we include the discussion to round out our analysis on the issue.

[77] *See* 38 C.F.R. §§ 20.600-20.605, 20.700-20.715 (2021). AMA claims fall under the general rules for Board hearings.

[78] The regulation is titled: "Designation of Member or Members to conduct the hearing in a legacy appeal."

[79] 38 C.F.R. § 20.604 (2021).

[80] The regulation is titled: "Designation of Member or Members to conduct the hearing."

At oral argument, largely in response to a pre-argument order the Court issued, appellant briefly discussed the "fair process doctrine."[81] Generally, the Court describes the "fair process doctrine" as an obligation placed on VA to provide claimants fair process in the adjudication of their claims.[82] This may include processes not required by statute or regulation if the principle of fair process requires an additional process because "it is implicitly required when viewed against [the] underlying concepts of procedural regularity and basic fair play of the VA benefits adjudicatory system."[83] We decline to consider how the fair process doctrine may apply with respect to situations in which different Board members conduct a hearing and render a decision in the appeal. Courts generally should not advance arguments for represented parties when such parties have declined to do so themselves.[84] More directly: courts should not be advocates. Not only do appellant's briefs fail to cite *Arneson*, they don't even mention fair process.[85] "[O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'"[86] Courts "'do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.'"[87] Therefore, we will not reach out to decide this appeal based on a ground appellant did not raise. We leave for another day an exploration of the fair process doctrine's role, if any, on the issue before the Court.[88]

---

[81] *See* OA at 9:25-:39, 24:12-:45, 34:38-40:40.

[82] *Smith v. Wilkie*, 32 Vet.App. 332, 337 (2020).

[83] *Id.* (internal quotations omitted).

[84] *See United States v. Sineneng-Smith*, __ U.S. __, 140 S. Ct. 1575, 1581 (2020); *Sellers v. Shinseki*, 25 Vet.App. 265, 274-75 (2012).

[85] *See* Appellant's Br. at 5-13; Reply Br. at 1-5.

[86] *Sineneng-Smith*, 140 S. Ct. at 1579 (quoting *Castro v. United States,* 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)).

[87] *Id.* The dissent asks the Court to do precisely what the Supreme Court has cautioned against: step into the shoes of the advocate and advance a theory not raised by appellant. *See Sineneng-Smith*, 140 S. Ct. at 1579. Even considering the Secretary's citation to *Arneson*, appellant still chose not to respond to this point in his reply brief. *See* Reply Br. at 1-5. Proceedings before the Court are adversarial in nature, and even in our pro-veteran system appellants must raise some semblance of an argument.

[88] We do note that it sometime appeared at oral argument that the parties viewed the matter as binary. That is, the fair process doctrine either always required the same Board member to preside at a hearing and decide an appeal, or it never did. While we have determined it would be inappropriate to decide this appeal on the basis of an argument appellant did not raise, we observe that we doubt the doctrine would apply in such an all-or-nothing way. So, perhaps

*B. The Board considered the lay statements of both appellant and his wife.*

Appellant focuses his argument on appeal principally on the contention that the Board erred because the Board member who conducted his AMA hearing did not also render the decision on his appeal. However, appellant also asserts that the Board erred when it denied him a higher disability rating because the Board did not consider statements about his prostrating headaches that both he and his wife made during the May 2019 Board hearing.[89] He also reframes that argument by maintaining that the Board did not adequately explain why it failed to consider those statements.[90] At the outset, we underscore that appellant bears the burden of persuading the Court that the Board has erred.[91] Here, appellant's argument is incredibly underdeveloped, meaning that, in effect, he has not carried his burden of showing that the Board clearly erred in its decision or failed to sufficiently explain its reasoning.

The Board's decision regarding the degree of disability under the rating schedule is a factual finding the Court reviews for clear error.[92] For all its findings on a material issue of fact and law, the Board must support its decision with an adequate statement of reasons or bases that enables a claimant to understand the precise bases for the Board's decision and facilities review in this Court.[93] To comply with its requirement to provide an adequate statement of reasons or bases, "the Board must analyze the credibility and probative value of the evidence, account for the evidence

---

the doctrine would have some purchase in a situation in which a Board member deciding a case made negative credibility determinations about a witness appearing at a hearing when the Board member did not preside at the hearing. Of course, that's not what happened here. *See* R. at 12-13 (finding that appellant's and his wife's lay assertions were outweighed by other evidence of record and not making an adverse credibility finding). In any event, in an appropriate case, we suspect the analysis of the impact of the fair process doctrine on the question before us would be more nuanced than it appeared during oral argument.

[89] *See* Appellant's Br. at 9-13.

[90] *See id.*

[91] *Hilkert v. West,* 12 Vet.App. 145, 151 (1999) (en banc) ("An appellant bears the burden of persuasion on appeals to this Court to show that such reliance was in error."), *aff'd*, 232 F.3d 908 (Fed. Cir. 2000).

[92] 38 U.S.C. § 7261(a)(4); *Dyment v. West*, 13 Vet.App. 141, 144 (1999); *see also Tedesco v. Wilkie*, 31 Vet.App. 360, 363 (2019); *Prokarym v. McDonald*, 27 Vet.App. 307, 312 (2015).

[93] 38 U.S.C. § 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990).

it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant."[94] If the Board fails to do so, remand is appropriate.[95]

Appellant contends that the Board did not consider the statements both he and his wife made during their testimony at the May 2019 Board hearing that appellant's headaches were prostrating in nature, and also that the Board decision did not "explain why the testimony . . . was not considered evidence."[96] Appellant is simply wrong when he states that the Board did not consider these statements as evidence. The Board considered these statements just as it did other evidence in the record.[97] Appellant may not agree with *how* the Board addressed the statements, but that disagreement does not mean that the Board did not consider the statements as evidence. The Board performed its role as factfinder when it considered the statements from appellant and his wife at the hearing (statements that have evidentiary weight[98]) and explained that they are outweighed by other evidence of record.[99] We need not address the nature of the Board's weighing of the evidence because appellant has not challenged that aspect of the Board's decision.[100] Just as we declined to make appellant's argument for him in connection with the Board hearing issue, we will not do so here. Therefore, because the Board properly considered the lay statements from appellant and his wife as evidence, we reject appellant's arguments on this issue.

## IV. CONCLUSION

After consideration of the parties' briefs, oral argument, the governing law, and the record, the Court AFFIRMS the September 11, 2019, Board decision.

---

[94] *Kahana v. Shinseki*, 24 Vet.App. 428, 433 (2011) (citing *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995)); *Gilbert*, 1 Vet.App. at 56-57.

[95] *Tucker v. West*, 11 Vet.App. 369, 374 (1998).

[96] Appellant's Br. at 10.

[97] *See* R. at 12, 13.

[98] *See Buchanan v. Nicholson,* 451 F.3d 1331, 1336-37 (Fed. Cir. 2006).

[99] R. at 13 ("Accordingly, the Board finds that the lay assertions of prostrating attacks are outweighed by the other evidence of record.").

[100] *See Pederson v. McDonald*, 27 Vet.App. 276, 281-86 (2015) (en banc). On a similar note, the dissent determined that the Board member who decided appellant's appeal implicitly found that appellant and his wife were not credible. If we were to consider such a claim it would again require the Court to step into the shoes of appellant and advance a theory that was not presented on appeal. Here, appellant does not even challenge the Board's weighing of the evidence, let alone an alleged implicit credibility finding.

JAQUITH, *Judge*, dissenting: The Board denied Army veteran Louis R. Frantzis fair process in the adjudication of his claim. Because the majority leaves that injustice intact, I respectfully dissent. Contrary to the majority's conclusion, the Court need not, should not, even must not fail to fulfill its responsibility to review this case for fair process.

## A. Salient Facts and Procedural History

Mr. Frantzis's headache disability originated in an unfortunate active service event: another soldier kicked him in the chest, lifting him up in the air. When Mr. Frantzis landed, the back of his head crashed onto a concrete slab and he woke up in a hospital on base with a concussion.[101] Mr. Frantzis filed a disability claim in October 2009 and it was denied the next month based on the lack of service treatment records.[102] Mr. Frantzis appealed and requested a Board hearing.[103] He testified under oath at two Board hearings: one on July 8, 2013, before Board member George E. Guido, Jr.,[104] and the other on May 6, 2019, before Board member James G. Reinhart.[105] Both hearings were conducted via videoconference, with the Board member in Washington, D.C., and the veteran in Muskogee, Oklahoma, with his wife and a representative who was not an attorney.[106]

At the first hearing, Mr. Frantzis testified that he had experienced episodes of "very scary" head pain since the attack in the barracks—sometimes causing him to lose vision and sometimes causing his head to go numb.[107] The veteran's wife testified that the veteran's headaches caused him to double over in pain and wrap his arms around his head, and the veteran's representative added that these scary painful events happen "multiple times a week, sometimes several in a day."[108] The veteran's condition was such that he said the light in the hearing room was bothering him.[109] Following the first hearing, Board member Guido remanded the veteran's headache

---

[101] R. at 2780-82.

[102] R. at 3098, 3015-18.

[103] R. at 2934.

[104] R. at 2778-88.

[105] R. at 44-67.

[106] R. at 44, 2778.

[107] R. at 2782-84.

[108] *Id.*

[109] R. at 2785.

disability claim because the veteran's file did not contain service personnel and treatment records and the veteran had not been afforded a VA examination regarding whether his headaches constituted a disability related to service.[110]

In August 2014, Mr. Frantzis was granted service connection for his headaches, effective October 2009, but with a noncompensable (0%) evaluation because no prostrating attacks were noted by the compensation and pension (C&P) examiner in April 2014.[111] In September 2014, Mr. Frantzis submitted his appeal, saying: "I have over 3 prostrating attacks every month. The pain in my head is so significant that I cannot function and have to l[ie] in a dark room for extended periods of time."[112] Less than 2 months later (in November 2014), a doctor examined the veteran and completed a disability benefits questionnaire. The doctor noted that the veteran had daily headaches with 2 to 3 flare-ups that lasted hours and reached a pain level of 8 to 10 out of 10; the veteran's headaches necessitated his withdrawal to a dark, quiet place and interfered with his ability to function; the veteran's symptoms included nausea, vomiting, and sensitivity to light and sound; and the veteran experienced very frequent prostrating and prolonged attacks of migraine headache pain and nonmigraine headache pain—more frequently than once per month (the highest category on the form).[113]

In March 2015, VA increased the veteran's headache disability rating to 10%, effective February 2010, and awarded a 50% disability effective on the date of the doctor's November 2014 examination.[114] Mr. Frantzis appealed the effective-date and rating determinations for his condition before November 2014[115] and asked for a Board hearing.[116]

At his May 6, 2019 hearing, the veteran again spoke of the lights causing a headache affecting his testimony.[117] Board member Reinhart made clear that in deciding the veteran's case, he would consider only the symptoms the veteran experienced during the timeframe covered by

---

[110] R. at 2736-37.

[111] R. at 2490-91.

[112] R. at 2477.

[113] R. at 2463-65.

[114] R. at 2432-33.

[115] R. at 2317, 2406-07.

[116] R. at 83.

[117] R. at 46-47.

the disputed rating decisions, not his current symptoms.[118] The veteran testified that in 2009 his headaches worsened and occurred a minimum of three to four times per week.[119] Mrs. Frantzis interjected that the veteran was having prostrating headaches every day; the veteran agreed that they were prostrating, saying: "I had headaches where I had to put my head under a pillow when I never heard of that before."[120] Board member Reinhart explained that "prostrating headaches" are "very frequent, and they cause economic problems," and asked when the veteran's headaches were "so bad that they forced [him] to l[ie] down in bed, that they interfered with [his] ability to make money and so forth."[121] The veteran testified that his headaches became that severe in 1986.[122] When asked whether his headaches in 2009 were as bad as they were in 2014, the veteran said that in 2009 they were bad enough that he had to isolate himself in a locked room with the lights off.[123] Mrs. Frantzis testified that from 2009-2014 the veteran was experiencing daily headaches that were prostrating "at least once a week, sometimes more," and his headaches became so severe that he was unable to work in 2015.[124] She said that before 2015 the veteran would come home with headaches and "shut down."[125] Mrs. Frantzis further testified that before 2014, the veteran "had headaches every day "and sometimes he'd l[ie] down for [] half an hour," but "at least once a week he was down and in the dark room for several hours to try to manage the pain."[126]

On September 11, 2019, Board member Theresa M. Catino denied the veteran's appeal.[127] The Board gave the veteran no prior notice that a different Board member would decide the veteran's case, no acknowledgement that there was a switch, and no explanation of why the switch was made.

---

[118] R. at 49-50.

[119] R. at 51.

[120] R. at 50-51.

[121] R. at 56.

[122] *Id.*

[123] R. at 57.

[124] R. at 58-59.

[125] R. at 60.

[126] R. at 63.

[127] R. 9-14.

**B. Remand is Required to Afford the Veteran His Right to Fair Process**

The principle of fair process is deeply rooted in our national identity. Establishing justice follows only "forming a more perfect union" in the description of the reasons for ordaining the Constitution that gave life to the United States of America. Days after signing into law the Judiciary Act of 1789, which created the Federal court system (beyond the U.S. Supreme Court), President Washington wrote that "the due administration of justice is the firmest pillar of good government."[128] The Bill of Rights prohibits deprivation of property without due process of law.[129] And a veteran's "entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment to the United States Constitution."[130] Such constitutional protection means that "[a] fundamentally fair adjudication . . . is constitutionally required in all [veterans claims] cases," and that veterans have a "due process right to a fair hearing" on their disability claims.[131]

In addition to protecting veterans' constitutional due process rights,[132] "[t]he Board is obligated to ensure that it provides [claimants] fair process in the adjudication of their claims."[133] The right to fair process also applies "during VA's solicitation, gathering, and development of evidence."[134]

Our Court first explicitly recognized veterans' right to fair process in *Austin v. Brown*[135] in 1994. Holding "that basic fair play requires that evidence be procured by the agency in an impartial, unbiased, and neutral manner,"[136] the *Austin* Court embraced the fair process principle

---

[128] Letter from George Washington to Edmund Randolph (Sept. 28, 1789), available at https://www.loc.gov/resource/mgw2.022/?sp=177&st=text.

[129] U.S. CONST. amend. V.

[130] *Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009).

[131] *Id.* at 1299-1300.

[132] *See Noah v. McDonald*, 28 Vet.App. 120, 133-34 (2016) (vacating a Board decision based on a due process violation).

[133] *Smith v. Wilkie*, 32 Vet.App. 332, 337 (2020); *see Nohr v. McDonald*, 27 Vet.App. 124, 135 n.5 (2014) ("[I]t is well-established that the Board must ensure that it provides an appellant fair process in the adjudication of his claim.").

[134] *Bryant v. Wilkie*, 33 Vet.App. 43, 47 (2020).

[135] *See* 6 Vet.App. 547, 551 (1994).

[136] *Id.* a 552.

20

it implicitly relied on in *Thurber v. Brown,*[137] a decision it had issued the preceding year, and the *Austin* Court seconded *Thurber*'s citation of the Supreme Court's invocation of implicit "underlying concepts of procedural regularity and basic fair play" in *Gonzales v United States*.[138] In *Thurber*, the Court began its analysis with the requirement of the due process clause of the Fifth Amendment of the U.S Constitution that an individual being deprived of a property interest through Federal Government action must be provided with notice and an opportunity to be heard.[139] The Court then surveyed statutory and regulatory provisions in concluding that "[t]he entire thrust of the VA's nonadversarial claims system is predicated upon a structure which provides for notice and an opportunity to be heard at virtually every step in the process."[140]

Veterans' rights to fair process in the development and adjudication of their claims and appeals extend beyond those guaranteed by the Fifth Amendment.[141] The right to fair process stems from the very "nature of the nonadversarial VA benefits adjudication system."[142] That system "is strongly and uniquely pro-claimant."[143] The system is strongly pro-claimant because it is a core value of our Nation "to care for him who shall have borne the battle and for his widow and his orphan"—as President Abraham Lincoln said in concluding his second inaugural address.[144] That core value reflects national gratitude for the "the special sacrifices made by veterans of military service"[145] and sets the overriding purpose of veterans benefits laws.[146]

---

[137] 5 Vet.App. 119 (1993).

[138] *Austin*, 6 Vet.App. at 551-52, (citing *Thurber*, 5 Vet.App. at 123 (quoting *Gonzales*, 348 U.S.407, 412 (1955)).

[139] *Thurber*, 5 Vet.App. at 122.

[140] *Id.*

[141] *See Bryant*, 33 Vet.App.at 46-47 ("Appellants have a right to fair process in the development and adjudication of their claims and appeals before VA," and that right "'is primarily based on the underlying concepts of the VA adjudicatory scheme, not the U.S. Constitution.'"(quoting *Prickett v. Nicholson*, 20 Vet.App. 370, 382 (2006), *aff'd sub nom. Prickett v. Mansfield*, 257 F. App'x 288 (Fed. Cir. 2007))); *Anderson v. West*, 12 Vet.App. 491, 497 (1999) ("[The] holding in *Thurber* was based on principles of 'fair process' and 'basic fair play' that the Court extracted from a variety of sources, including the U.S. Constitution, but *Thurber* did not rely upon a constitutional basis for its holdings as to the procedural protections owed to VA claimants.").

[142] *Bryant*, 33 Vet.App.at 46.

[143] *Hodge v. West*, 155 F.3d 1356, 1362 (Fed. Cir. 1998).

[144] *See Noah*, 28 Vet.App. at 130 (citing *Ribaudo v. Nicholson*, 21 Vet.App. 137, 163 (2007) (en banc) (Schoelen, J., dissenting) (quoting President Lincoln)).

[145] *Johnson v. Robison*, 415 U.S. 361, 381 n.15 (1974).

[146] *Barrera v. Gober*, 122 F.3d 1030, 1039-40 (Fed. Cir. 1997) (Plager, J., concurring); *see Sneed v. Shinseki*, 737 F.3d 719, 728 (Fed. Cir. 2013) ("The veterans benefits scheme is . . . 'imbued with special beneficence from a grateful

As the Supreme Court has recognized, the system that Congress created for the adjudication of veterans claims is dramatically more protective of veterans' rights than the construct for ordinary civil litigation.[147] In contrast with ordinary civil cases, the adjudication of veterans claims is nonadversarial; "VA is charged with the responsibility of assisting veterans in developing evidence that supports their claims, and in evaluating that evidence, the VA must give the veteran the benefit of any doubt."[148] The longstanding solicitude of Congress for veterans[149] is reflected in "laws that 'place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions.'"[150] The Court of Appeals for the Federal Circuit has also observed that Congress reserved special treatment for veterans and equitable principles apply strongly in veterans cases because "veterans risked both life and liberty in their military service to this country."[151] In sum, as our Court has declared: "The entire veterans claims adjudication process reflects the clear congressional intent to create an Agency environment in which VA is actually engaged in a continuing dialog with claimants in a paternalistic, collaborative effort to provide every benefit to which the claimant is entitled."[152] The appellate process "is designed to be a partnership between the appellant and the Agency," and "[t]hat partnership only works if the Board allows an appellant to contribute to and meaningfully participate in the appellate process."[153]

In this case, the Board failed to fulfill its obligation to uphold these principles and denied the veteran notice[154] and an opportunity to meaningfully participate in the appellate process. The

sovereign.'" (quoting *Bailey v. West*, 160 F.3d 1360, 1370 (Fed. Cir. 1998) (Michel, J., concurring)); *Gilbert v. Derwinski*, 1 Vet.App. 49, 54 (1991) (declaring that, in veterans benefits determinations, the benefit of the doubt goes to veterans in in recognition of our debt to them). *See generally United States v. Alvarez*, 567 U.S. 709, 724 (2012) ("In periods of war and peace alike public recognition of valor and noble sacrifice by men and women in uniform reinforces the pride and national resolve that the military relies upon to fulfill its mission.").

[147] *Henderson v. Shinseki*, 562 U.S. 428, 440 (2011).

[148] *Id.*

[149] *See United States v. Oregon*, 366 U.S. 643, 647 (1961) ("The solicitude of Congress for veterans is of long standing.").

[150] *Henderson*, 562 U.S. at 440 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 416 (2009) (Souter, J., dissenting)).

[151] *Sneed*, 737 F.3d at 728.

[152] *Evans v. Shinseki*, 25 Vet.App. 7, 16 (2011).

[153] *Bryant*, 33 Vet.App.at 48.

[154] The veteran learned of the switch in the Board decision by the substituted Board member. There was no reason given for the substitution. Though not grounded in the special solicitude veterans receive for their service, sacrifice,

Court has held that fair process requires (1) notice of evidence the Board obtains after the RO issues a Statement of the Case, and (2) an opportunity to respond to that evidence,[155] including by submitting additional evidence in rebuttal without having to show good cause to do so.[156] Fair process requires the Board to afford the veteran notice and an opportunity to be heard before deciding a question not addressed by the RO, such as a question of the Board's jurisdiction.[157] Fair process requires VA to provide the veteran a copy of a medical examination report and other evidence developed on remand and to afford the veteran an opportunity to respond to the evidence before the Board considers and relies on it.[158] Fair process prohibits the Board from relying on undisclosed documents in deciding the merits of the veteran's claims.[159] Fair process requires the Board to set a deadline, provide notice of the deadline, and afford the veteran an opportunity to submit evidence before adjudicating a claim when the Board has left the record open following a hearing.[160] Fair process requires that the veteran's surviving spouse be informed of the proper legal basis for the reduction of DIC benefits and an opportunity to challenge that reduction.[161] Fair process requires the Board to (1) provide notice of the evidence and the reliance proposed to be placed on it; (2) afford the claimant an opportunity to respond; and (3) consider and address the claimant's response.[162] The system for the development and adjudication of veterans benefits claims is so deeply imbued with fairness that irregular procedures such as those involved in apportionment claims "evoke[] fair process concerns."[163]

---

and suffering, the federal Federal civil system substitutes judges only if the judge conducting a hearing is unable to proceed, and then "the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden." FED. R. CIV. P. 63.

[155] *Thurber*, 5 Vet.App. at 126.

[156] *Austin*, 6 Vet.App. at 551. And " basic fair play requires that evidence be procured by the agency in an impartial, unbiased, and neutral manner." *Id.* at 552. The Board cannot secure evidence "to support a predetermined outcome." *Id.*

[157] *Bernard v. Brown*, 4 Vet.App. 384, 394 (1993); *Marsh v. West*, 11 Vet.App. 468, 471-72 (1998).

[158] *Young v. Shinseki*, 22 Vet.App. 461, 472 (2009); *Newday v. Peake*, 22 Vet.App. 262, 264-65 (2008).

[159] *Hood v. Shinseki*, 23 Vet.App. 295, 302 n.3 (2009).

[160] *Haney v. Nicholson*, 20 Vet.App. 301, 305-06 (2006).

[161] *Roberts v. McDonald*, 27 Vet.App. 108, 112 (2014).

[162] *Nohr*, 27 Vet.App. at 135 n.5 ("Inherent in the Board's duty to provide a claimant a reasonable opportunity to respond to the newly acquired evidence is the countervailing duty to consider and address the claimant's response.").

[163] *Fuller v. McDonough*, 35 Vet.App. 142, 158 (2022).

The Court's prior exposition of the foundational fair process principle and its grounding (and expression) in the requirements of notice and a meaningful opportunity to be heard by a Board member who considers and addresses the veterans response points pellucidly to the right result of this appeal—a remand for Mr. Frantzis to be afforded fair process. And *Arneson v. Shinseki*[164] both compels that conclusion and maps out the correct decision.

As in *Arneson*, Mr. Frantzis was never notified that a substitute "factfinder had been assigned to adjudicate his appeal, and never given the opportunity provided by statute and regulation to have a hearing before that decisionmaker."[165] In this case, as in *Arneson*, the switcheroo (here from Board member Guido to Board member Reinhart to Board member Catino) "gives an appearance of forum shopping" and "unfairness," regardless of any good faith basis for changing the assignments.[166] "In the claimant-friendly world of veterans benefits, 'the importance of systemic fairness and the appearance of fairness carries great weight.'"[167]

However—again as in *Arneson*—"the perception of unfairness is not the only issue here."[168] Changing Board members post-hearing—such that the decisionmaker is "assessing credibility based on a second-hand conveyance or a review of a transcript—undermines the claimant's ability to personally impress his credibility upon his factfinder[]." Moreover, "the right to a hearing as a conduit for conveying one's credibility could be rendered meaningless" if the credibility determination is made by a Board member who did not participate in the veteran's hearing.[169] Mr. Frantzis has a "right to be afforded the opportunity to be heard by [the Board member] assigned to adjudicate his appeal."[170]

In conducting hearings and deciding veterans' cases, the Board "functions as a factfinder in a manner similar to that of a trial court."[171] So "the opportunity for a personal hearing before the

---

[164] 24 Vet.App. 379 (2011).

[165] *Id.* at 387. Mr. Frantzis also received no notice or information indicating that his participation in RAMP meant that the Board member conducting his hearing might not decide his case. R at 1598.

[166] *Id.* at 387 n.2.

[167] *Id.* at 387 (quoting *Hodge*, 155 F.3d at 1363).

[168] *Arneson*, 24 Vet.App. at 387.

[169] *Id.* at 387-88.

[170] *Id.* at 388.

[171] *Cook v Snyder*, 28 Vet.App. 330, 336 (2017).

Board is significant because it is the [veteran's] one opportunity to personally address [the Board member] who will find facts, make credibility determinations, and ultimately render the final Agency decision on his [or her] claim."[172] The Board hearing is uniquely important because it gives the veteran the ability to address and respond to any specific questions by the decisionmaker and enables the Board member to size the veteran up—to assess the witness's demeanor, facial expressions, eye contact, voice tone and inflection, gestures, and hesitation or readiness to answer questions—all the nonverbal cues that help a listener decide whether a speaker is credible.[173]

As in *Arneson*, "[w]e cannot say how a hearing before [the] Board member[] assigned to adjudicate his appeal would have affected the Board's determinations on credibility, probative weight, and ultimately [the veteran's] claim."[174] However, the assignment of Board member Catino "to decide [the veteran's] administrative appeal, without providing an opportunity for a hearing, deprived [the veteran] of an opportunity to meaningfully participate in the processing of his claim in a way that could have altered the Board's credibility determinations."[175] As in *Arneson*, remand is warranted for the Board to afford Mr. Frantzis the opportunity for a hearing in front of his decisionmaker. This case should be as clear cut as that.[176]

### C. Proper Statutory Construction Does Not Upend Fair Process

The majority's statutory construction contentions are insufficient to upend the fair process principles upon which the veterans benefits system is founded. The Court has already reconciled fair process with the circumstances here: "[I]n situations where no particular procedural process is required by statute or regulation, the principle of fair process may nonetheless require additional process if it is implicitly required when 'viewed against [the] underlying concepts of procedural regularity and basic fair play' of the VA benefits adjudicatory system." As previously detailed, Mr. Frantzis's right to fair process included a right to a hearing before his Board decisionmaker.

---

[172] *Id.* at 336-37.

[173] *See generally Quinn v. Wilkie*, 31 Vet.App. 284, 292 (2019) (declaring that it is important that an adjudicator be able to observe the demeanor of a veteran at a hearing).

[174] *Id.*

[175] *Arneson,*. 24 Vet.App. at 388-89.

[176] Where the Board deprives a veteran of fair process, the Court need not reach the constitutional due process question. *Bryant*, 33 Vet.App. at 46; *Smith*, 32 Vet.App. at 337 ("Because the Court agrees with [the veteran] that the Board violated his right to fair process, it need not reach the Constitutional question of due process.").

Moreover, the majority opinion rests on a mistaken premise: that the *Arneson* Court "did not rely whatsoever on section 7102 in rendering the decision."[177] The Court's specific description of its action says otherwise: "[W]e hold that the Board violated 38 U.S.C. §§ 7102, 7107, and 38 C.F.R. § 20.707."[178] And the majority sees a separation of the provisions that *Arneson* does not support. Instead, the Court considered sections 7102 and 7107 together.[179] The *Arneson* Court expressly faulted the Secretary for failing to consider "the import of section 7102(a) and its interaction with all of section 7107."[180] Judge Kasold, concurring in the result, was even more firmly focused on the interplay of section 7102(a)'s requirement that the assigned Board member "shall make a determination" on the claimant's appeal and the claimant's entitlement to a hearing: Judge Kasold declared that "because a claimant's appeal cannot be adjudicated until he is afforded the opportunity to be heard by the Board assigned to adjudicate his appeal, it follows that the claimant has a right to be heard by the Board member or panel assigned to adjudicate his administrative appeal."[181] So the language of section 7102 was and is important, not irrelevant.[182]

The majority's mantra that "section 7102 does not govern Board hearings"[183] misses the mark. It is true that section 7102 does not prescribe the docketing, location, or manner of such hearings, but section 7102 does govern something at least as important: the assignment of the Board member who conducts the hearing and that Board member's responsibility.

The disappearance of section 7107's relevant provisions requires sharper attention to section 7102. Effective in 2019, section 7107 no longer addresses the participation of Board members in hearings. As currently constituted, section 7107 focuses on docketing. Section 7107(c) concerns the "manner and scheduling of hearings," but that is limited to determining whether the hearing will be held at the Board's principal location or "by picture and voice transmission" either at a VA facility, or, upon request by the appellant, at a location the appellant

---

[177] *See* discussion *ante* p. 8.

[178] *Arneson*, 24 Vet.App. at 386.

[179] *Id*. at 383-85. *Arneson* did reject the Secretary's reliance on a prior version of section 7102 and a (confusingly similarly named) case interpreting it, *Arnesen v. Brown*, 8 Vet.App. 432, 441 (1995), but not the version of 7102 still applicable today.

[180] *Arneson*, 24 Vet.App. at 384.

[181] *Id.* at 390.

[182] *Cf. ante* p. 11.

[183] *See* discussion *ante* pp. 10, 11; *ante* note 67.

selects. Now the only statute that addresses the assignment of Board members—to conduct hearings or otherwise—is section 7102. Section 7102(a) provides:

> A proceeding instituted before the Board may be assigned to an individual member of the Board or to a panel of not less than three members of the Board. A member or panel assigned a proceeding shall make a determination thereon, including any motion filed in connection therewith.

38 U.S.C. § 7102(a).

Notwithstanding the majority's disregard for it, section 7102's actual words support Judge Kasold's construction in *Arneson*. When the intent of Congress is clear from statutory language, that concludes our effort to interpret that language.[184] Section 7102(a) expressly provides that a Board "member . . . assigned a proceeding shall make a determination thereon."[185] By statute and regulation, "[e]very claimant has . . . the right to a hearing."[186] Among the *Black's Law Dictionary* definitions of "proceeding" is "a hearing."[187] And the definitions of "hearing" in *Black's Law Dictionary* encompass "[a]n administrative agency proceeding in which evidence is offered."[188] In addition, an adjudication hearing under administrative law is "[a]n agency proceeding in which a person's rights and duties are decided after notice and an opportunity to be heard."[189] In sum, the very essence of a hearing is that it is a proceeding that affords the veteran an opportunity to present information to a decisionmaker. The most that can be said is that a hearing is a part of the proceeding on which the assigned Board member is obliged to make a determination under 7102(a). What happened in this case clearly violated section 7102(a). Board member Reinhart was

---

[184] *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993).

[185] 38 U.S.C. § 7102(a).

[186] 38 C.F.R. § 3.103(a) (2021). The "refocusing" of 38 U.S.C. § 7107 deleted the codification of the veteran's right to a hearing in section 7107(b). But if we read the words carefully, as this dissent does with those of section 7102(a), we still find a statutory right to a hearing in 38 U.S.C. §§ 7105(a) ("Each appellant will be accorded hearing and representation rights pursuant to the provisions of this chapter and regulations of the Secretary.") and 7107(c) (implying that a veteran who requests a hearing gets one). If the majority's construction of these statutes takes hold, the veteran's right to a hearing is in peril.

[187] *Proceeding*, BLACK'S LAW DICTIONARY 1437 (11th ed. 2019).

[188] *Hearing*, BLACK'S LAW DICTIONARY 865 (11th ed. 2019).

[189] *Adjudication hearing*, BLACK'S LAW DICTIONARY 865 (11th ed. 2019). Moreover, the verb "institute" means "[t]o begin or start; commence." *Institute*, *id.* at 951. So there is nothing "nonsensical," *see ante* note 75, in noting that a proceeding under section 7102 may be and at least encompasses a hearing.

assigned the proceeding—whether defined as the hearing or the appeal to the Board—and failed to make a determination on it.

When the Court considered section 7102 and the relevant (and specific) version of section 7107(c) together in *Arneson*, the Court concluded that "it cannot be said that 'Congress has directly spoken' to the question of whether a claimant is entitled to a hearing before all the Board members assigned to decide his appeal."[190] The majority fills the hole with a presumption that Congress intended to remove the requirement that the veteran's decisionmaker conduct the hearing to which the veteran is entitled.[191]

Presumed intent is far from express language and plain meaning. A prominent author made that point dramatically: "When truth and reason cannot be heard, then must presumption rule."[192] The law does not go that far, but it does recognize that presumptions are not conclusive and "may be overcome by more persuasive considerations."[193]

First, if "we can presume that Congress understood the nature of our *Arneson* holding,"[194] Congress would not have foreseen that the Board's reaction to a shift from the specific provision in the former section 7107(c) to the broader provision in section 7102(a) would imperil the veteran's right to meaningfully participate in a hearing before his or her decisionmaker. Congress would have read *Arneson* as the Court should—as reaffirmation that the adjudication of veterans benefits cases is truly pro-claimant and nonadversarial, such that the system would take care of claimants—rather than pro-veteran in name only.[195] The majority's view runs headlong into the presumption that when Congress "adopts a statute, related judge-made law is presumed to remain in force and work in conjunction with the new statute absent a clear indication otherwise."[196] In

---

[190] *Arneson*, 24 Vet.App. at 385 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).

[191] *See* discussion *ante* pp. 9-10.

[192] BARBARA W. TUCHMAN, A DISTANT MIRROR: THE CALAMITOUS 14TH CENTURY 559 (1978) (quoting Admiral Jean de Vienne, 1341-1396).

[193] 1A NORMAN J. SINGER ET AL, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 22:30 (7th ed. 2007).

[194] *See* discussion *ante* p. 9.

[195] *See* Michael P. Allen, *Due Process and the American Veteran: What the Constitution Can Tell Us About the Veterans' Benefits System*, 80 U. CIN. L. REV. 501, 530 (2011).

[196] Larry M. Eig, *Statutory Interpretation: General Principles and Recent Trends*, Cong. Rsch. Serv. 20 (Sept. 24, 2014), *available at* http://www.sgp.fas.org.

other words, "[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."[197] And if Congress had intended to do so it obviously could have specifically said—in sections 7102, 7107, or elsewhere—that the Board may assign different Board members to conduct the hearing and decide the case. The circumstances signal that there is no clear expression of congressional intent in the statutory shift here. When Congress declines to expressly state its intention, we should be sparing in presuming it. That is especially true when the presumption contravenes the core construction canon in veterans law—the pro-veteran canon.

### D. The Pro-Veteran Canon Requires Resolving Any Ambiguity in the Statutory Scheme in the Veteran's Favor

The longstanding pro-veteran canon is based on the principle "'that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'"[198] The AMA amplified the statutory ambiguity *Arneson* addressed,[199] and the pro-veteran canon mandates that the interpretive doubt be resolved in the veteran's favor.[200]

In the case most often cited to invoke the pro-veteran canon, *Gardner v. Brown*, the Board denied the veteran's claim for benefits under 38 U.S.C. § 1151 based on disabilities resulting from surgery in a VA facility.[201] The Board's denial rested on 38 C.F.R. § 3.358(c)(3) (1993), which interpreted the statute as only covering an injury that proximately resulted from fault by the VA or from an accident during treatment or rehabilitation.[202] Though the statute afforded compensation for injuries resulting from surgery, rather than the veteran's misconduct, and said

---

[197] *Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 501 (1986).

[198] *Henderson*, 562 U.S. at 441 (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991)); *see Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946) ("[Veterans laws are] to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need.").

[199] The majority's declaration that "we do not find the statutes ambiguous," *ante* note 74, is a further departure from *Arneson*. In *Arneson*, the Court found that reading sections 7102 and 7107 together left ambiguity—even though the Court was reading the more specifically prescriptive version of section 7107 then applicable. *See* 24 Vet.App. at 385. Now that section 7102 provides the sole surviving statutory directive, if its plain meaning isn't adequate or applicable, as the majority contends, there is ambiguity and interpretive doubt the pro-veteran canon resolves for the veteran.

[200] *See Gardner v. Brown*, 513 U.S.115, 118 (1994); *Osman v. Peake*, 22 Vet.App. 252, 256 (2008).

[201] *Gardner*, 513 U.S. at 116-17.

[202] *Id*.

29

nothing about fault by VA, the Secretary argued that a fault requirement inhered in the statutory requirement of a compensable injury.[203] In rejecting that argument based on the law's "text and reasonable inferences from it," the Supreme Court looked first to the pro-veteran canon, which it summarized as "the rule that interpretive doubt is to be resolved in the veteran's favor."[204]

The pro-veteran canon is at least a competing presumption that must be given precedence in veterans benefits cases. In *King v. St. Vincent's Hospital*, the Supreme Court stated that it presumed that Congress understood the pro-veteran canon as a basic rule of statutory construction, and the Court applied that canon to read a provision in the veteran's favor, even if the language left the significance of the provision unsettled.[205] And in *Henderson v. Shinseki*, the Supreme Court read the statute at issue in light of the veteran's canon, declaring that "[w]hile the terms and placement of [the statute] provide some indication of Congress' intent, *what is most telling here* are the singular characteristics of the review scheme that Congress created for the adjudication of veterans' benefits claims."[206] The pro-veteran canon requires reading 7102 to require the Board member who is the decisionmaker and the Board member who conducts the hearing on which the decision is based to be the same person.

### E. The Public Record Undermines the Majority's Presumption of Congressional Intent

Nothing has been found in the legislative history—by the Court or the parties—to show that Congress, in passing the AMA, expressly considered the question of whether the same Board member who conducts the hearing must or need not render the decision. That topic was not mentioned in the testimony by VA and Board leaders before the Senate or House Veterans' Affairs

---

[203] *Id.* at 117.

[204] *Id.* at 117-18; *see* Chadwick J. Harper, *Give Veterans the Benefit of the Doubt:* Chevron*,* Auer*, and the Veteran's Canon*, 42 HARV. J.L. & PUB. POL'Y 931, 958-59, 961 (2019) ("The language and logic of [*Gardner*] suggest that courts should apply the veteran's canon before turning to deference doctrines," and "*Gardner*'s suggested order of operations" is one reason "the veteran's canon should be recognized as a traditional tool of interpretation.").

[205] 502 U.S. at 221 n.9; *see Kisor v. McDonough* (*Kisor IV*), 995 F.3d 1316, 1327 (Fed. Cir. 2021) (Reyna, J., dissenting) ("[T]he pro-veteran canon is a traditional tool of construction" that requires the court to "discern the purpose of a veterans' benefit provision in the context of the veterans' benefit scheme as a whole and ensure that the construction effectuates, rather than frustrates, that remedial purpose: that benefits that by law belong to the veteran go to the veteran."), *cert. denied*, No. 21-465, 2022 WL 89296 (U.S. Jan. 10, 2022).

[206] 562 U.S. at 440-42 (emphasis supplied). *See Kisor IV*, 995 F.3d at 1366 (O'Malley, J., dissenting) ("The pro-veteran canon of construction . . . is a tool in the interpretive toolkit that aids in gleaning congressional intent where the plain text of the statute or regulation does not clearly answer the question at hand.").

Committees in 2017. VA assured Congress that "[t]he Appeals Modernization Act transforms VA's complex and lengthy appeals process into one that is simple, timely and *fair* to Veterans."[207] And the House Committee on Veterans' Affairs reported that "[t]he purpose of [the AMA] is to expedite VA's appeals process while protecting veterans' due process rights."[208]

Moreover, the regulation VA promulgated to implement the AMA, 38 C.F.R. § 20.706, says only that "[h]earings will be conducted by a Member or panel of Members of the Board"—nothing about whether the Board member who conducts the hearing must or need not decide the case—and the regulation cites both section 7102 and section 7107 as authority. In publishing the proposed regulation for public comment, VA was not explicit regarding what it intended, saying only that "VA proposes to add new § 20.706 to differentiate the procedures for appeals in the new system, similar to proposed § 20.604, applicable to legacy appeals."[209] And when it promulgated the new rules, VA said it rejected receiving recordings in lieu of formal hearings because any efficiency gained was "greatly outweighed by the benefits of an in-person hearing, the purpose of which is to elicit relevant and material testimony, assess the credibility of witnesses, resolve disputed issues of fact, and pose follow-up questions to witnesses and representatives."[210] The Secretary offered no explanation of how his agency's stated position on the benefits of an in-person hearing for the factfinder to assess the credibility of witness is consonant with sacrificing those benefits in favor of expedience, saying only "that goes to the content of the hearing . . . not who is going to decide the appeal after the hearing has happened."[211] And the Secretary acknowledged that expedience is the basis for the Board's substitution policy:

---

[207] *The State of the Department of Veterans Affairs: A 60-Day Report: Hearing Before the S. Veterans' Affs. Comm.*, S. Hrg. 115-631, at 13 (2018) (statement of Robert Wilkie, Secretary of Veterans Affairs) (emphasis added), available at https://www.congress.gov/event/115th-congress/senate-event/LC68018/text?g=%7B%22search%22%3A%5B%22S.+Hrg.+115-631%22%2C%22S.%22%2C%22Hrg.%22%2C%22115-631%22%5D%7D&s=2&r=52.

[208] H.R. REP.. NO. 115-135, at 2 (2017), available at https://www.congress.gov/congressional-report/115th-congress/house-report/135/1?overview=closed. In light of the understanding of Congress that the AMA protects veterans' due process rights, the presumption that Congress intended to curtail veterans' right to a meaningful hearing is an absurd result we can and should avoid. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) ("[A] statutory construction that causes absurd results is to be avoided if at all possible.").

[209] VA Claims and Appeals Modernization, 83 Fed. Reg. 39,818, 39,835 (Aug. 10, 2018).

[210] VA Claims and Appeals Modernization, 84 Fed. Reg. 138, 158 (Jan. 18, 2019).

[211] OA at 56:13–57:04.

[T]he Board has a computer system that assigns the cases . . . it's programmed to assign the cases to the VLJ[212] who heard the hearing if they're available. If they're not available within 30 days of when the docket assignment is reached . . . for the particular appeal then it will assign [the case] to another VLJ because . . . this is consistent with the AMA's provisions of trying to make the process more efficient. [The substitution policy is based on expedience] because that's consistent with the AMA.[213]

VA's written public descriptions of the appeals process for veterans continue to indicate that the same Board member who hears their case will decide it.[214] The Board offers a pamphlet titled "How Do I Appeal?" which says: "The Veterans Law Judge does not make a decision at the hearing. After the hearing, a transcript of the hearing is created and associated with your file and will be reviewed by the Veterans Law Judge together with all other evidence in deciding your appeal."[215]

And in its blog VAntage Point, in an April 5, 2021, post titled "How to Get a Virtual Hearing at the BVA [Board of Veterans' Appeals]," VA wrote:

The Veteran, their [sic] representative and the Judge all meet to discuss the Veteran's appeal. The Judge is there to help, asking the Veteran questions to better understand the appeal. After the hearing, the appeal is held for about 90 days or more before the Judge reviews the appeal and issues a decision.[216]

The Board's handling of this case reinforced the impression VA's public statements convey: that the Board member who conducts the hearing will decide the case. The Board member who conducted the May 2019 hearing, James Reinhart, by referring to himself in the first person, told the veteran and his wife that he—Board member Reinhart—would be deciding the veteran's case:

---

[212] "VLJ" is an initialism standing for "veterans law judge." *See* 38 C.F.R. § 20.101(b) (2021) ("A Member of the Board (other than the Chairman) may also be known as a Veterans Law Judge.").

[213] OA at 57:36–58:13.

[214] The Court takes judicial notice of these public government documents and their equivalent. *See Bareford v. McDonough*, 35 Vet.App. 171, 174 n.2 (2022); *Van Dermark v. McDonough*, 34 Vet.App. 204, 213 n.4 (2021).

[215] DEP'T OF VETERANS AFFAIRS, "HOW DO I APPEAL?" 10 (VA Pamphlet 01-15-02B, May 2015), https://www.bva.va.gov/docs/Pamphlets/How-Do-I-Appeal-Booklet--508Compliance.pdf. The pamphlet continues to be used by the Board to guide veterans through the appeals process, https://www.bva.va.gov/Frequently_Asked_questions.asp (last accessed June 2, 2022).

[216] Dep't of Veterans Affairs, *How to get virtual hearing at the BVA*, VANTAGE POINT (Apr. 5, 2021), https://blogs.va.gov/VAntage/85732/how-to-get-a-virtual-hearing-at-the-bva/ (last accessed June 2, 2022).

"[T]hat issue will not be before *me*";[217] "[a]nything you tell me about how your current headaches are is not going to make any difference because *I* can't look at that";[218] and "if it's a VA doctor, *I'll* have the records."[219] Board member Reinhart's assurances accorded with the veteran's experience at his July 2013 hearing, where the Board member conducting that hearing—Board member Guido—said: "If I think I need any additional evidence before *I* make a decision *I* will get evidence before *I* make a decision and when *I* do it will be in writing and that's how you'll be notified in a written decision."[220]

### F. The Facts of this Case Illustrate the Importance of Testifying Before the Decisionmaker

In May 2019, the Board member who conducted the hearing—Board member Reinhart— asked the veteran and his wife specific questions that they answered under oath regarding the frequency and severity of the veteran's headaches, all of which was on the record and reflected in a verbatim transcript. That process sharply distinguishes hearing testimony from treatment records and examination reports that do not include recorded, verbatim questions and answers. Because the pivot point here was the period during which the veteran suffered prostrating headaches and the frequency of those experiences, it was particularly significant that the Board member discussed those issues with the veteran and his wife and described what "prostrating" meant. Board member Reinhart's interaction with the veteran and his wife put him in position to assess their credibility and judge whether any inconsistencies between their testimony and treatment and examination records were minor, innocent variances or indicators of the veteran's and his wife's unreliability.

In addition, Board member Reinhart concluded the hearing by thanking the veteran and his wife for their testimony—and telling the wife: "I want to thank you for your help in the memory issues and everything like that. You were very helpful."[221] A reasonable person told that they were very helpful in resolving memory issues would be justified in having the impression that the Board considered the person's testimony credible.

---

[217] R. at 45 (emphasis added).

[218] R. at 50 (emphasis added).

[219] R. at 61 (emphasis added).

[220] R. at 2787-88(emphasis added).

[221] The Board member who conducted the July 2013 hearing likewise characterized the testimony of the veteran and his wife as "very helpful." R. at 2788.

But the substituted Board member, Theresa Catino, decided otherwise—without meeting, speaking with, or hearing from the veteran and his wife. The majority's observation that "perhaps the [fair process] doctrine would have some purchase in a situation in which a Board member deciding a case made negative credibility determinations about a witness appearing at a hearing when the Board member did not preside at the hearing," but "that's not what happened here,"[222] fails to acknowledge the dodge the Board deployed. Substitute Board member Catino did indeed find that the lay assertions by the veteran and his wife were outweighed by other evidence of record.[223] However, first she signaled that she did not consider the testimony of the veteran and his wife to be evidence.[224] And the substitute Board member's implicit adverse credibility determination is obvious from both the words she used and her otherwise clearly erroneous assessment of the evidence. In the substitute Board member's words: "the Veteran and his wife testified that the severity of his headaches has been characteristic of prostrating attacks since 2009. However, the evidence does not show that his headaches were productive of prostrating attacks."[225] A decisionmaker could not "imply" an adverse credibility determination more clearly than effectively saying to the veteran and his wife: "You testified that there were prostrating attacks, I find that there weren't." That the Board decision screams "I don't believe you" is made more emphatic—if that is possible—by reviewing "the other evidence of record" the substitute Board member cited as outweighing the testimony: "VA treatment records and [the veteran's] April 2014 examination report."[226]

---

[222] *Ante* note 88.

[223] R. at 12-13.

[224] In *Garlejo v. Derwinski*, 2 Vet.App. 619, 620 (1992), the Court rejected the Secretary's argument that a veteran's statement was not evidence. The veteran argues that the Board's failure to explain this characterization constitutes a failure to state adequate reasons or bases for its decision. Appellant's Br. at 11-12. Whatever the merits of that argument in isolation, the contention that the Board's stated reasons or bases are inadequate is borne out by fulsome review of the Board decision.

[225] R. at 12.

[226] R. at 12-13. As noted above, *supra* note 222, in the process of donning its blinders, the majority first opines that the Board made no credibility determination, *see ante* note 88, and then pivots to opining that we should not consider whether it did because that would "require the Court to step into the shoes of appellant and advance a theory that was not presented on appeal," because "appellant does not even challenge the Board's weighing of the evidence," *see ante* note 100. Contrary to the majority's ungenerous summary of the veteran's contentions, he did challenge the Board's weighing of the evidence, albeit without using the majority's chosen words. The veteran argued that "the Board made a fact error when it determined that Frantzis did not suffer migraines with prostrating attacks before February 11, 2010, or November 13, 2014." Appellant's Br. at 9 (text in all capitals replaced with plain text). The veteran argued that the Board should have made a credibility determination regarding his and his wife's testimony that the veteran

On the topic of prostrating attacks, the April 2014 C&P examination report says only this: "Does the Veteran have characteristic prostrating attacks of migraine/non-migraine headache pain? [ ] Yes  [X] No."[227] So it was just an X, with no explanation, discussion, or rationale to tell the Board the basis for that X or how it squares with the veteran's acknowledged head injury and recurrent serious headache pain and light sensitivity. And there are only a few VA treatment reports in the record for the relevant period: (1) A February 2010 nurse's note that says the veteran was having headaches that caused blurred vision four to five times per day and chronic pain that interfered with his mobility and other activities of daily living, but the note doesn't address prostration;[228] (2) a March 2013 neurology consultation note from a resident physician that also doesn't specifically address prostration but says that the veteran had experienced headaches since he was knocked out in the Army, with "pressure pain like a vice grip" that "may radiate throughout the day," and that the pain is acute several times a day or (if medicated) several times each week, and is as severe as 10 out of 10, with the veteran seeing stars and experiencing vertigo;[229] and (3) a disability benefits questionnaire a doctor completed in November 2014 describing similar symptoms and concluding that the veteran had "very frequent prostrating (and prolonged) attacks of migraine headaches."[230]

The substitute Board member's conclusion that the veteran's February 2010 description of his headaches "did not include characteristic prostrating attacks" is an unexplained medical opinion that the nurse who wrote the report did not render.[231] The February 2010 nurse's note does not reflect whether the nurse asked the veteran about prostration or whether the nurse formed an

---

suffered prostrating headaches, and that the absence of corresponding contemporaneous records did not render their testimony not credible. *Id.* at 10-11. The veteran also argued that the Board failed to provide adequate reasons or bases for its decision not to credit the testimony by the veteran and his wife "about the onset, worsening, and prostrating nature of [the veteran's] headaches," instead acknowledging their testimony in one sentence but saying there was no evidence of prostrating headaches in the next sentence. *Id.* at 11-12. Finally, at oral argument, the veteran's counsel pressed the point that the Board had discounted the testimony by the veteran and his wife without proper explanation. OA at 3:02-4:33, 39:11-:44, 1:33:55-:34:42.

[227] R. at 2619.

[228] R. at 2981.

[229] R. at 2435.

[230] R. at 2464.

[231] *See Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1991) ("[The Board] must consider only independent medical evidence to support [its] findings rather than provide [its] own medical judgment in the guise of a Board opinion."), *overruled on other grounds by Hodge v. West*, 155 F.3d 1356 (Fed. Cir. 1998).

opinion on whether the disabling effects of the veteran's headaches were prostrating. The Board similarly recast the March 2013 consult report that did not address prostration as a report that showed there was none.[232] And the Board likewise characterized as not reporting prostrating attacks the July 2013 testimony of the veteran and his wife that he was experiencing sudden, very sharp headache pain that doubled him over multiple times a week, sometimes several times a day, as well as completely disabling headaches with visualization of flashes of light.[233]

The Board's conclusory invocation of unspecified treatment records and a conclusory examination report to reject the testimony of the veteran and his wife highlights the inadequacy of its statement of reasons or bases for its decision. More than that, the Board's dismissal of the veteran's lay evidence illustrates the flip side of *Miller v. Wilkie*—it is the "indication that the Board found [] lay evidence not credible" that renders *Miller*'s presumption of an implied finding of credibility inapplicable.[234] Of course, a veteran's testimony and other evidence may be outweighed by contrary evidence without impugning the veteran's credibility, such as when the veteran does not have the medical knowledge to diagnose disease or determine etiology. But competence is not an issue here—the case turns on the evidence of whether the veteran's chronic headaches leave him exhausted or powerless, which no one is better positioned than the veteran and his wife to know.[235] There was no proper foundation for the Board to draw adverse inferences from the absence of any mention of prostration in the February 2010 and March 2013 medical

---

[232] R. at 10-11.

[233] R. at 11, 2783-86.

[234] *See Miller v. Wilkie*, 32 Vet.App. 249, 260 (2020) ("[A]bsent an indication that the Board found . . . lay evidence not credible, or had a reason not to address its credibility—such as [finding] the veteran not competent to report the symptoms—we will conclude that the Board found the lay evidence credible . . . ."). Other Judges have noted circumstances similar to those present in this case. *See Reynolds v. McDonough*, No. 20-4340, 2022 WL 593622, at *3 (Vet. App. Feb. 28, 2022) (mem. dec.) (Toth, J., declaring that the *Miller* presumption does not apply where the Board clearly indicated that the veteran's report was not credible); *Foster v. McDonough*, No. 19-7806, 2021 WL 2250578, at *3 (Vet. App. June 3, 2021) (mem dec.) (Moorman, J., holding that *Miller* does not require the Court to conclude that the Board made an implicit positive credibility determination when the Board, in determining that medical examinations were the most probative evidence, indicated that it made an implicit negative credibility finding concerning the veteran's statements); *Taylor v. Wilkie*, No. 19-3937, 2020 WL 6733765, at *3 (Vet. App. Nov. 17, 2020) (mem. dec.) (Laurer, J., remanding the case where the Board's treatment of the appellant's statements allows for multiple interpretations); *Benson v. Wilkie*, No. 19-2303, 2020 WL 2177395, at *5 (Vet. App. May 6, 2020) (mem. dec.) (Allen, J., remanding where the Board discussion could "be read as making a negative credibility determination").

[235] *See, e.g.*, *Barr v. Nicholson*, 21 Vet.App. 303, 307 (2007) (holding that a veteran is competent to report on observable symptomatology).

reports.[236] The Board could not make the implicit adverse credibility determination it did here without violating its obligation to explicitly analyze the credibility of the evidence, and especially that of the evidence favorable to the veteran.[237] This failure to follow fair process principles presents the most insidious example of the credibility trap—affording the veteran no notice of any credibility concerns and no opportunity to address and have the decisionmaker consider his or her credibility, shrouding those shortcomings in a pretense of weighing probativeness.[238]

*Arneson* illustrates the point precisely. If substituted Board member Catino found the testimony by Mr. Frantzis and his wife concerning the prostrating consequences of his headaches credible, the veteran would not need contemporaneous medical corroboration to substantiate his claim.[239] And even "[f]inding [the veteran's] testimony credible and yet assigning it little weight could very well reflect the fact that the credibility assessment was based, in part, on second-hand conveyance or record review, as opposed to personal assessment.[240] So the *Arneson* Court's conclusion applies here: "Regardless, because the Board's statement is unclear as to whether it found [the veteran's] testimony concerning . . . his symptoms credible," the argument that the Board decision is based on probative weight and not credibility "is without merit."[241]

### G. The Court Should Not Decline to Consider and Require Fair Process

The majority declines to consider whether the veteran was denied fair process because the veteran's attorney "did not make such an argument until well into the appeal,"[242] and then "largely

---

[236] *See Fountain v. McDonald*, 27 Vet.App. 258, 272 (2015).

[237] *See Harvey v. Shulkin*, 30 Vet.App. 10, 15 (2018); *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

[238] *See generally* Daniel L. Nagin, *The Credibility Trap: Notes on a VA Evidentiary Standard*, 45 U. MEM. L. REV. 887, 901 (2015) (describing the credibility trap as the practice of affording a veteran no opportunity to respond to the Board's concerns with the veteran's credibility before the Board notes them in a negative decision). The opacity may be motivated by concern for veterans' feelings but the national gratitude for veterans' service, sacrifice, and suffering obliges the Board member conducting a hearing "to explain fully the issues and suggest the submission of evidence which the claimant may have overlooked and which would be of advantage to the claimant's position," as well as to ask questions "to explore fully the basis for [the] claimed entitlement." 38 C.F.R. § 3.103(d)(2) (2021). That obligation goes unfulfilled when the decisionmaker who identifies and resolves the issues is substituted after the hearing.

[239] *Arneson*, 24 Vet.App. at 388.

[240] *Id.*

[241] *Id.* The situation is even worse based on the Board's implicit adverse credibility determination.

[242] *See* discussion *ante* p. 2.

in response to a pre-argument order the Court issued."[243] I would not so readily forego our judicial responsibility for the foundation of fairness on which the adjudication of veterans' claims rests.

As an initial matter, though I share the majority's concern over the timing and thoroughness of the arguments on the veteran's behalf, I find waiver of the veteran's right to fair process to be too harsh a sanction. And the majority overlooks factual, procedural, and substantive reasons why waiver is inappropriate. First, the veteran argued to the Board Chairman (in a motion for reconsideration) "that the Board erred because the VLJ who conducted [his] Board hearing was not the same VLJ who issued the decision." At the Court, the veteran's opening argument for reversal challenged the Board's action to switch VLJs "without providing notice."[244] In so doing, the veteran invoked the touchstone of fairness in veterans law: "notice and an opportunity to be heard at virtually every step in the process."[245] In his reply brief, the veteran argued "that it was wrong for the [Board] to switch judges on a veteran after the hearing, but before deciding the case." In this context, "wrong" is synonymous with "unfair."[246] Then the Court ordered the parties to be prepared to discuss the impact of *Arneson* and how the principle of fair process applies to this case, and such a discussion ensued at oral argument. Declining to consider the issues we raised is incongruous with that order.

At oral argument, the veteran's counsel contended—in the face of the majority's then expressed contrary opinions—that: *Arneson* and its "fair practice" discussion "should stand as the law";[247] the new version of section 7107 doesn't say that the Board is allowed to switch judges— section 7107 doesn't address who presides at all;[248] section 7102 still applies and the member who was assigned to the proceeding, which would include the hearing, did not make a determination,

---

[243] *See* discussion *ante* p. 14.

[244] Appellant's Br. at 6.

[245] *Thurber*, 5 Vet.App. at 123.

[246] A "wrong" is "an injurious, unfair, or unjust act." *Wrong*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/wrong (last accessed June 8, 2022); *see Wrong*, CAMBRIDGE DICTIONARY ONLINE, https://dictionary.cambridge.org/us/dictionary/english/wrong (last accessed June 8, 2022) (defining "wrong" as "an unfair action."); *United States v. Brunson*, 30 M.J. 766, 768 (A.C.M.R. 1990) ("The first dictionary definition for 'wrongful' is 'full of wrong: INJURIOUS, UNJUST, UNFAIR ( [e.g.], a wrongful act).'" (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2642 (1981))).

[247] OA at 9:25-:39, 23:30-24:45.

[248] OA at 11:42-12:25, 18:40-19:00, 21:16-23:00.

as required;[249] *Smith* says that fair process requires the Board, when it "changes its position in a way that's material to the outcome of the case," to give the veteran notice and an opportunity to respond;[250] *Arneson* discusses fair process in a situation the same as the situation here and says it is very important "that the individual who makes the decision has the opportunity to see and hear the veteran" and witness and "can assign credibility determinations from that testimony";[251] "the entire point of the of the fair process discussion in the *Arneson* decision was that it still falls on the fact that the person who . . . writes [the decision] should be a person who got to see the witness for [himself or herself]";[252] and if the Board switches judges it must give "notice to the veteran with [an] opportunity to respond and if the veteran asks for a new hearing then the hearing will be held."[253] So the majority's allegation that this dissent "asks the Court to . . . step into the shoes of the advocate and advance a theory not raised by the appellant"[254] is wrong. The veteran met or exceeded the majority's standard by raising "some semblance of an argument."[255]

"[T]he refusal to consider arguments not raised is a sound prudential practice . . . [but] there are times when prudence dictates the contrary."[256] And it is beyond dispute that "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."[257] There are also sound

---

[249] OA at 14:33-14:46, 33:03-:50.

[250] OA at 35:23-:43.

[251] OA at 37:28-38:01.

[252] OA at 40:19-:39.

[253] OA at 42:22-:33.

[254] *See ante* note 87. And the case the majority cites is inapposite. In *Sineneng-Smith*, the Supreme Court addressed the Ninth Circuit's "radical transformation" of the case by taking it over, and after the parties had briefed the case, ordering further briefing—not by the parties but by three organizations—to address issues the parties had not raised, and then the Supreme Court decided the case based on one of those issues. 140 S. Ct. 1575, 1578-82 (2020). Here, "[u]nlike the Ninth Circuit in *Sineneng-Smith*, the Court did not sideline the parties in favor of soliciting arguments from strangers to the litigation. Rather, the Court asked the parties—and only the parties—to address the issues that it felt needed addressing." *United States v. Powell*, 467 F. Supp. 3d 360, 384 n.13 (E.D. Va. 2020). In the actual circumstances of the veteran's case, we should decline the majority's "invitation to turn inartful briefing into waiver," decline "to adopt the judicial blinders" the majority favors, and exercise our discretion to identify and apply the law, because allowing the Board's "decision to stand would seriously undermine the integrity and perceived fairness of our judicial system." *See United States v. McReynolds*, 964 F.3d 555, 568-70 (6th Cir. 2020).

[255] *See ante* note 87.

[256] *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring).

[257] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see Mason v. Shinseki*, 25 Vet.App. 83, 94 (2011).

prudential reasons for declining to consider undeveloped arguments when the Court cannot discern the allegation of error.[258] And the Court should not dictate litigation strategy or tactics that fall within the rules of fair play.[259] Neither concern is present here, but some important veterans law principles that should get the Court's attention are.[260]

One important principle is the duty to generously construe veterans' pleadings. "The Government's interest in veterans cases is that justice be done, and the systemic fairness essential for securing justice includes a duty to construe veterans' submissions sympathetically."[261] This principle also requires the Court to liberally construe represented veterans' procedural arguments, particularly where, as here, the veteran raised the argument before the Board.[262]

Most importantly, "[t]his Court's caselaw requires us to ensure compliance with reasonable notice and fair process."[263] So the Court had an *obligation* to address the fair process issues—especially in light of *Arneson* (which the Secretary cited in his brief). The lesson taught at Army judges' school—"stay in your lane"—is a sound one, but the lane of appellate judges includes identifying and applying the proper construction of governing law.[264] And we do the parties a disservice if we don't engage them on the issues at oral argument—and we also increase the risk of a mistake, born of misunderstanding, that adversely affects our jurisprudence. The Court is an independent judicial body that doesn't work for VA, and its judges are neither veterans' advocates nor agency apologists.[265] But judges do not become advocates or apologists by stating a view of

---

[258] *See Locklear v. Nicholson*, 20 Vet.App. 410, 416-17 (2006).

[259] *See Ashley v. Derwinski*, 2 Vet.App. 307, 311 (1992).

[260] *See Mason*, 25 Vet.App. at 98 (Kasold, J., dissenting).

[261] *Perciavalle v. McDonough*, 35 Vet.App. 11, 30 (2021).

[262] *Scott v. McDonald*, 789 F.3d 1375, 1381 (Fed. Cir. 2015). "To hold that a veteran forfeits his right to have his claims read sympathetically if he seeks assistance" from an attorney might discourage veterans from seeking such assistance. *See Comer v. Peake*, 552 F.3d 1362, 1370 (Fed. Cir. 2009).

[263] *Roberts v. McDonald*, 27 Vet.App. 108, 111 (2014); *see Holliday v. Principi*, 14 Vet.App. 280, 289 (2001) ("[B]oth the Federal Circuit's and this Court's caselaw require us to ensure compliance with fair process."), *overruled on other grounds by Kuzma v. Principi*, 341 F.3d 1327 (Fed. Cir. 2003); *Castellano v. Shinseki*, 25 Vet.App. 146, 157 (2011) ("In the context of veterans claims and benefits, our analysis is guided by the dictates of fair process."). "The judiciary . . . is peculiarly equipped to act as the guardian of fair process."); *Moore-McCormack Lines, Inc. v. United States*, 413 F.2d 568, 581 (Ct. Cl. 1969) (when the Federal Circuit was created in 1982, the judges of the Court of Claims continued in office as judges for the Federal Circuit. Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, § 165, 96 Stat. 25, 50.).

[264] *See Kamen.*, 500 U.S. at 99.

[265] *See, e.g., Am. Legion v. Nicholson*, 21 Vet.App. 1, 3 (2007) ("Congress established this Court under Article I of

the law that coincides with that of a party, or by asking tough questions that indicate the judge's view of the case or questions about a position that a party has only alluded to—whether it is that the appellant was denied fair process or that the appellant waived his fair process argument by not raising it in his briefs.[266] We must be unbiased, not uninterested.

## H. Conclusion

Veterans' entitlement to fair process in the adjudication of their claims is "the bedrock" of the veterans benefits system.[267] In light of the prevalence of determinations based on evidence that "is circumstantial at best,"[268] the importance—to both individual veterans and systemic fairness—of the right to an opportunity to provide direct evidence to the Board member deciding the veteran's case cannot be overstated. Mr. Frantzis was denied that opportunity. It is beyond question that Mr. Frantzis's inability to personally testify before his factfinder may have significantly affected the outcome of his claim.[269] I cannot join my distinguished colleagues in turning a blind eye to *Arneson* and the veteran's right to a meaningful hearing before the Board member who decides his fate. When we forego fair process, it is past time for concern over the nature of the veterans benefits system.[270] I respectfully dissent.

---

the U.S. Constitution to provide our nation's veterans and their families with independent judicial review of Board decisions."); *Wisner v. West*, 12 Vet.App. 330, 334 (1999) ("[The Court's] adjudication of veterans' claims is a judicial activity, independent of the Secretary's position."), *aff'd sub nom. Abbs v. Principi*, 237 F.3d 1342 (Fed. Cir. 2001).

[266] The former is the essence of the majority's allegation against the dissent; the latter was the majority's suggestion to the Secretary at oral argument. OA at 1:11:17-:32. As previously indicated, the majority made clear its views regarding statutory construction, fair process, and the credibility determination while questioning the veteran's counsel. *See discussion supra* pp. 38-39.

[267] *Roberts v. Shinseki*, 23 Vet.App. 416, 432 (2010) (Hagel, J., concurring in part), *aff'd in part*, 647 F.3d 1334 (Fed. Cir. 2011).

[268] *Hodge*, 155 F.3d at 1363.

[269] *See Arneson*, 24 Vet.App. at 388.

[270] *See* Michael P. Allen, *Due Process and the American Veteran: What the Constitution Can Tell Us About the Veterans' Benefits System*, 80 U. CIN. L. REV. 501, 530 (2011) ("If the system these veterans have to 'navigate' is one in which the VA is actually acting in their interest in a pro-claimant, non-adversarial manner, [a] district judge's concern [over the large percentage of military members with relatively little formal education] is misplaced. If, on the other hand, the process is non-adversarial in name only, the judge's concern is one we should all share.").